1    WO

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9    Cornell Lasalle Aydlett,                    No. CV-14-02289-TUC-EJM

10              Plaintiff,                        **ORDER**

11   v.

12   Carolyn W Colvin,

13              Defendant.

14

15          Plaintiff Cornell Lasalle Aydlett ("Aydlett") brought this action pursuant to 42

16   U.S.C. § 405(g) seeking judicial review of a final decision by the Commissioner of Social

17   Security ("Commissioner"). Aydlett raises four issues on appeal: 1) whether the

18   Administrative Law Judge ("ALJ") failed to consider substantial evidence regarding

19   Aydlett's lack of medical treatment; 2) whether the ALJ improperly rejected the non-

20   examining state-agency medical consultant's residual functional capacity ("RFC")

21   opinion; 3) whether the ALJ improperly rejected the treating physician's RFC opinion;

22   and 4) whether the ALJ failed to consider substantial evidence on record. (Doc. 17 at 8).[1]

23   _____

24          [1] Plaintiff's Opening Brief also states that he "moves to amend his [disability onset
     date] to June 15, 2010 as he was denied unemployment benefits on the basis of his
25   inability to work as of June 13, 2010." (Doc. 17 at 3). However, Plaintiff makes no
     specific arguments on this point and thus the Court will not address it here. *See infra* note
26   7.

27          Plaintiff's Opening Brief further states that he "has sought further treatment since
     the date of the ALJ's decision, not on record. As his impairments are degenerative in
28   nature, Plaintiff humbly prays for remand for a physician's review of his past and current
     treating records and radiological exams for a determination as to the start of his
     disability." *Id.* at 6.

Before the Court are Aydlett's Opening Brief and Defendant's Response. (Docs. 17 & 21). Aydlett did not file a Reply. The United States Magistrate Judge has received the written consent of both parties and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of Civil Procedure. The Court finds no error and thus the Commissioner's decision will be affirmed.

## I.   Procedural History

Aydlett filed an application for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") on March 8, 2010. (Administrative Record ("AR") 260–66). Aydlett alleged disability beginning January 15, 2009 (AR 260) based on knee problems, shoulder pain, back pain, and bone pain. (AR 319). Aydlett's application was denied upon initial review (AR 80, 143) and on reconsideration (AR 104, 153). A hearing was held on September 15, 2011 (AR 53), after which ALJ Lauren R. Mathon found, at Step Four, that Aydlett was not disabled because he was able to perform his past relevant work as a maintenance person/property manager, a liquidator, a pizza delivery driver, a

---

Pursuant to LRCiv 16.1(a)(4):

> If any requested remand is for the purpose of taking additional evidence, such evidence must be described in the opening brief, and Plaintiff's argument must show that the additional evidence is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

Further, "[u]nder 42 U.S.C. § 405(g) (Supp.2001), in determining whether to remand a case in light of new evidence, the court examines both whether the new evidence is material to a disability determination and whether a claimant has shown good cause for having failed to present the new evidence to the ALJ earlier." *Mayes v. Massanari*, 276 F.3d 453, 461–62 (9th Cir. 2001). To be material under section 405(g), new evidence must bear "directly and substantially on the matter in dispute." *Ward v. Schweiker*, 686 F.2d 762, 764 (9th Cir. 1982). Further, the claimant must "demonstrate that there is a 'reasonable probability' that the new evidence would have changed the outcome of the administrative hearing." *Mayes*, 276 F.3d at 462. Finally, the claimant must demonstrate good cause for failing to produce the evidence earlier by "demonstrate[ing] that the new evidence was unavailable earlier." *Id*. at 643.

Here, Aydlett does not elaborate on what specifically the new evidence is, nor does he explain how the evidence is material or why it was not presented in a prior proceeding. In light of Plaintiff's failure to comply with Rule 16.1(a)(4) or otherwise make any meaningful argument on this point, the Court declines to remand this matter for consideration of the alleged new evidence.

mail room stock person, and an assembler (AR 133).

On June 28, 2012 the Appeals Council granted Aydlett's request to review the ALJ's decision. (AR 139–41). The Appeals Council vacated the ALJ's decision and remanded the case back to the ALJ because the ALJ's "decision did not acknowledge or identify the specific weight assigned to the Physical Residual Functional Capacity Assessments provided by the State agency physicians, Drs. Dickstein and Kalen," and because the decision did not provide adequate rationale in support of the finding that Aydlett could perform his past relevant work. (AR 139). The Appeals Council directed the ALJ to: update the record and obtain additional evidence concerning Aydlett's degenerative disc disease, and, if warranted, obtain a consultative orthopedic exam and medical source statements; give further consideration to Aydlett's maximum RFC and provide rationale with specific references to evidence of record and explain the weight given to medical source opinions; give further consideration to whether Aydlett is capable of performing any past relevant work and obtain evidence from a vocational expert ("VE"). (AR 140).

A second hearing was held on October 10, 2012 (AR 31), after which ALJ Lauren Mathon again found, at Step Four, that Aydlett was not disabled because he was capable of performing his past relevant work as a pizza delivery person and as a hand packer (AR 25). On June 18, 2014 the Appeals Council denied Aydlett's request to review the ALJ's decision. (AR 1).

## II.   Factual History

Aydlett was born on August 18, 1969, making him 39 at the alleged onset date of his disability. (AR 80). Aydlett has a high school education and completed one year of college. (AR 320). He has worked a number of different jobs, including assembler/delivery driver, maintenance man, maintenance/potter, roofing, and stocker. (AR 321).

### A. Treating Physicians

A letter from Dr. John J. Wild, Jr. dated May 4, 2009 states that Aydlett has been

1    under Dr. Wild's care since 1993. (AR 576). The letter was submitted as part of Aydlett's

2    unemployment benefits claim (*see* AR 66, 489), and states as follows:

3                The last time we saw him, he had severe endstage arthritis of
             his knee post-traumatic. It is my opinion at this time that it is
4            deleterious to his health to work in any type of full
             weightbearing capacity, or capacity requiring frequent
5            walking, lifting, or any heavy activities. This is a permanent
             restriction. He should be retrained so that he can continue to
6            work.

7    (AR 576).

8        Aydlett was seen at Arizona Family Practice on January 20, 2010 with a complaint

9    of back pain for 1–2 months. (AR 594). Aydlett stated that he thought the pain was from

10   his knee problems, and that he could hardly bend over. The progress notes are largely

11   illegible, but indicate that Aydlett had a torn MCL/ACL in his left knee in 1994, and a

12   meniscus tear in his right knee. The doctor assessed lower back pain and degenerative

13   joint disease in the knees, and recommended an x-ray of the lumbar spine.

14       Aydlett was seen for x-rays of the lumbar spine on January 22, 2010. (AR 590).

15   The impression was minimal lumbar scoliosis convex to the right. Findings noted that

16   "[t]he disc spaces are fairly well maintained," "[t]here is no evidence of acute fracture or

17   subluxation," and "[t]he pedicles are intact." *Id.*

18       Aydlett was seen at Arizona Family Practice on February 8, 2010 and reported

19   continuing severe back pain. (AR 593).

20       Aydlett had a MRI of the lumbar spine on May 13, 2010. (AR 589). The

21   impression was a large central disc herniation at L5-S1. Findings were:

22

23                L5-S1 has a huge central disc herniation nearly filling the
             spinal canal. This is deviating both S1 nerve roots. There is
24           some degenerative narrowing to the neural foramina
             bilaterally.
25                The remainder of the intervertebral disc levels are
             unremarkable. Facet degenerative changes are seen at L3-4
26           and L4-5. Signal intensity in the conus medullaris is
             unremarkable. Signal intensity in the bone marrow is
27           unremarkable.

28   *Id.*

On July 16, 2010 Aydlett went to Arizona Family Practice for treatment of an ingrown toe nail. (AR 592).

Discharge instructions from Northwest Medical Center dated May 25, 2011 include the following information about radiculopathy:

> Your spinal nerve roots have been hurt or damaged. . . . The damage may be due to a forceful accident. It may be due to something pressing on the nerve root, such as a "slipped disc" or tumor. It may also be due to something that causes the nerve to swell, such as some diseases. You may feel weakness, tingling or pain in the area that the nerve leads to (arm, shoulder, leg or foot). Treatment is aimed at the cause of the damaged nerve root.

(AR 605). The instructions stated that Aydlett should:

See your doctor **regularly.**

Protect this area from more injury.

Move your affected part often to keep it from getting stiff.

Avoid heavy lifting (more than 10 pounds).

Apply a heating pad to the area that hurts.

*Id.*

B.  Physical Therapy

A physical therapy evaluation summary dated February 18, 2010 indicates that Aydlett presented with a several month history of low back pain with pain radiating into his right leg. (AR 586). The report states that Aydlett's pain was a 8/10 and that significant impairments were gross lumbar range of motion and functional mobility and posture, with Aydlett reporting a significant decline in his ability to stand to cook and to exercise. The report notes that "there is good potential for therapy goals" and that Aydlett would be seen for PT twice a week for 3 weeks.

At a PT appointment on February 22, 2010, Aydlett reported that his pain was a 9/10 when standing and a 4/10 when sitting. (AR 584). On February 24, 2010, Aydlett reported that he felt a pop in his right leg when doing press ups and that he was sore. (AR 583). An appointment on March 3, 2010 was cancelled because Aydlett was late. (AR

582). On March 5, 2010 Aydlett stated that he had a car accident and that he had pain in his lower back, left buttock, and left leg and knee, and that his pain was a 9/10. (AR 581). On March 8, 2010 Aydlett reported that he was doing better until the accident and that he now had pain in his right leg. (AR 580). On March 10, 2010 Aydlett stated that his pain was a 4/10 and that he had no leg symptoms. (AR 579). An appointment on March 16, 2010 was cancelled when Aydlett did not call or show up. (AR 578).

### C.  State-Agency Consulting Physicians

Dr. Scott Krasner saw Aydlett for a consultative evaluation on August 24, 2010. (AR 595). Aydlett's chief complaints were knee, shoulder, and back pain. Aydlett reported that he first had problems with his knees when he dislocated his left knee playing football in high school, and that he had ligament problems in his right knee from football and martial arts. Aydlett stated that he had arthroscopic surgery of his right knee in 1982 for ligament repair and surgery of his left knee by Dr. Wild in 1994 to repair ACL and MCL tears. Since that time, the pain in his knees has gotten worse to the point that he has difficulty walking. He saw Dr. Wild in February 2009 and Dr. Wild recommended that he stop doing the type of work that he was doing. Aydlett stated he had not had any medical treatment for his knees since last seeing Dr. Wild.

Aydlett reported that he injured his back in January 2009 when he was moving furniture. He was seen by Dr. Wallach and had x-rays and a MRI, and was referred to a neurosurgeon, but had not seen the neurosurgeon yet.

At the consultative exam, Aydlett reported that his knees were feeling fine and that he still had pain in his back, especially when sitting down. Aydlett stated that his back pain was worse when waking up and occasionally radiates down his right leg to his calf. He denied numbness or tingling and stated he was not taking any medications.

On examination, Dr. Krasner noted the following pertinent findings:

> Musculoskeletal: Examination of his back reveals that he stands erect . . . There is some moderate tenderness in his lower back, although there are no muscle spasms present. He is able to forward flex 60 degrees, backwards extend 30 degrees, flex laterally 40 degrees in each direction. He states of having pain with range of motion of his back.

> He is able to walk normally. He can walk on his heels and toes and do a deep-knee bend fully. When he does a deep-knee bend, he states of having low back pain and left knee pain.
>
> He has full range of motion of the hips, knees, and ankles with normal muscle strength. . . . he has decreased sensation over the lateral aspect of his left knee and leg.
>
> He has full range of motion [of the knees]. . . . There is some crepitus with flexion/extension bilaterally, though no pain.

(AR 596). In his assessment, Dr. Krasner noted that, "[g]iven [Aydlett's] history and exam, he will have some mild effects on his functional capabilities especially as it pertains to heavy lifting." (AR 597). Dr. Krasner recommended work restrictions as follows: no lifting over 50 pounds maximum, repetitively over 25 pounds; and no restrictions on standing, walking, kneeling, or crouching.

Dr. Krasner referred Aydlett for x-rays of his left knee. The x-ray report stated that Aydlett was "status post ACL repair. There are tricompartmental degenerative changes which are moderate to severe. There is prepatellar soft tissue swelling with a joint effusion." (AR 604).

Dr. Krasner also completed a Medical Source Statement of Ability to do Work-Related Activities and indicated that Aydlett's conditions would impose limitations for 12 continuous months. (AR 601). Dr. Krasner opined that Aydlett could occasionally[2] lift and/or carry 50 pounds, and could frequently[3] lift and/or carry 25 pounds. *Id.* He further indicated that Aydlett had no limitations in standing, walking, sitting, climbing, stooping, kneeling, crouching, crawling, reaching, handling, fingering, or feeling, and assessed no environmental limitations. (AR 601–02).

### D.  Additional Medical Information

On September 1, 2010 DDS physician Dr. Stephen Dickstein made an initial determination that Aydlett was not disabled. (AR 89–90). He noted that Aydlett was only

---

[2] "Occasionally" is defined as "up to 1/3 [generally no more than two hours] of an eight-hour day."

[3] "Frequently" is defined as "1/3 to 2/3 of an eight-hour day."

partially credible because his allegation of being unable to carry clothes on hangers was overly restrictive. (AR 85). Dr. Dickstein completed a RFC assessment with the following limitations: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for 6 hours in an 8-hour workday; sit for more than 6 hours; unlimited pushing and pulling; frequently climb ramps/stairs, crouch, and crawl; never climb ladders/ropes/scaffolds; unlimited balancing and stooping; avoid heights and concentrated exposure to extreme cold; and avoid moderate exposure to fumes, odors, dusts, gases, poor ventilation, and hazards. (AR 86–88). Dr. Dickstein noted that Aydlett did not have the RFC to perform his PRW as actually performed because Aydlett's RFC was for medium work and he reported lifting up to 100 pounds. However, Aydlett did have the RFC to perform his PRW as a maintenance man as it is normally performed in the national economy. (AR 89).

On reconsideration, Aydlett was again found not disabled on January 6, 2011. (AR 113). Disability examiner Larry Moser noted that Aydlett alleged changes on reconsideration, but that the only new condition, illness, or limitation was a doctor's note about toenail pain. (AR 108). The reconsideration report notes that Aydlett is credible, that the "left knee [osteoarthritis] is a major contributing factor to claimant's functional impairment," and that "x-rays of [the left knee were] not known at CE and MSS which shows moderate to severe tricompartmental [osteoarthritis] impacting functional impairment significantly." (AR 109). Dr. Kalen completed a RFC assessment with the following limitations: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk 4 hours; sit more than 6 hours; unlimited pushing and pulling; occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl; never climb ladders/ropes/scaffolds; avoid heights and concentrated exposure to extreme cold; and avoid moderate exposure to fumes, odors, dusts, gases, poor ventilation, and hazards. (AR 109–11). Dr. Kalen opined that Aydlett did not have the RFC to perform his PRW as actually performed or generally performed, but that he could perform other sedentary work. (AR 112–13).

E. Plaintiff's Testimony

On an undated Disability Report, Aydlett stated that he stopped working because of knee problems, shoulder pain, back pain, and bone pain, and that he could not sit or stand for long periods. (AR 319).

On an undated Disability Report—Appeal, Aydlett reported that "[i]t is getting harder to do easy tasks like walking sitting or just laying down." (AR 347). He stated that he has "jarred my neck to where my body goes numb with tingling in arms & fingers" and that he had "numbness in arms & tingling in finger tips." (AR 347–48). He also stated that he had tingling in his arms when sneezing and numbness in his neck when looking up. (AR 352). Aydlett reported that he could not sit or stand for long periods and could not play with his daughter or do family activities. (AR 351).

On an undated Exertional Daily Activities Questionnaire, Aydlett described his daily activities as caring for his daughter including preparing her meals, doing her hair, taking her to school (walking due to vehicle problems), and helping her with homework. (AR 337). His daily activities also include doing the dishes, showering, laundry, and watching tv. Aydlett reported that it is difficult to bend over and that he gets sharp pains in his back and sometimes his leg, that his knee gives out when walking, making it difficult to walk his daughter to school, and that it hurts to change positions even while sitting. He walks as needed to do everyday functions, and it takes him about 30 minutes to walk his daughter 1.3 miles to school. Aydlett reported that it hurts to lift and carry things and that he tries to carry clothes on hangers but it's difficult. (AR 338). He does his own grocery shopping and cleaning but has stopped doing laundry because of back pain and has difficulty doing dishes due to standing too long in one spot. He drives but stated he does not do any activities outside of his home because he can't do the activities he used to do. Aydlett stated that before he became disabled, he "used to be able to do dishes and laundry all the time. Now I'm very limited because of the pain. When I did try to help with the laundry it frustrated me because just to carry 3 to 4 clothes items on hangers, hurt to the point I had to put them down and let me [sic] wife do it." He does not

take any medications but uses a TENS unit.[4] (AR 339). Aydlett stated that it was very frustrating to be constantly in pain, that simple movements cause him pain, and that he hates not being able to do activities with his daughter.

On a letter dated July 10, 2011 Aydlett wrote: "I have not been going to see doctors because of not being able to afford to. I don't have insurance and without insurance it is hard to get to see the specialists that have been recommended. Watching my wife working so hard and still struggling is depressing." (AR 360).

Aydlett testified at his hearing before the ALJ on September 15, 2011. He stated that his wife has supported him since January 2009, that they receive $15 a month in food stamps, and that he previously received unemployment insurance benefits. (AR 58). Aydlett testified that when he applied for unemployment benefits, he stated that he was able and ready to work, and that he actively looked for jobs like cooking, phone work, delivery jobs, and sit-down jobs like secretary. (AR 59). When he applied for jobs, he indicated that he had knee, back and neck problems and was looking for sit-down jobs. (AR 64–65). When questioned by the ALJ about cooking not being a sit-down job, Aydlett stated that he had to go apply for the jobs that the employment office told him to apply for. (AR 65).

Regarding his medical treatment, Aydlett testified that Dr. Wild is an orthopedic surgeon and that Dr. Wild wrote him a letter for his unemployment claim. (AR 66). Aydlett has not had any treatment with Dr. Wild since the 1990s. He received AHCCCS from approximately March 2009 to September 2010 and saw Dr. Kisner, his primary care physician at Arizona Family, during this time, but did not get treatment for his knee. (AR 67). Aydlett went to see Dr. Kisner because he started having problems with his back and neck. (AR 68). Dr. Kisner wanted to send him to a neurosurgeon but Aydlett lost his insurance so he cannot go to specialists. (AR 66, 69). Aydlett testified that he could not go to the doctor as much as he wanted to for his problems due to lack of insurance, and

---

[4] "TENS, or transcutaneous electrical nerve stimulation, is a back pain treatment that uses low voltage electric current to relieve pain." http://www.webmd.com/back-pain/guide/tens-for-back-pain

that when he previously tried to get insurance he was denied due to a preexisting condition. (AR 69). He does not take any pain medication because he can't afford it. (AR 71). Aydlett reported his PT "went good while I was able to do it with the insurance, but [I] can't do it without the insurance." (AR 74).

Aydlett stated that he could not sit for more than 2 hours a day without his legs going numb, and that after 2 hours he would have to stand up and walk around. (AR 71). In an 8 hour workday, he would have to get up 6 or 7 times to walk around. He can stand for about 15 minutes before needing to sit down. (AR 73). The ALJ noted that Aydlett had been sitting for about 20 minutes, and he stated that the bottom of his back was killing him. (AR 73).

In a typical day, getting out of bed is "treacherous" because it hurts. (AR 71). Aydlett gets his daughter ready for school but "[m]ost of the time she has to help me." He drives his daughter to school but has had to walk her a couple of times when they were having car problems. (AR 72). He can walk for a mile if he has to get his daughter to school, but "[a]ny other time I'm not going to do it" because "[i]t hurts too much." (AR 73). Doing dishes used to take him 10 or 15 minutes but now takes 2 hours because he has to go sit down. (AR 72). Aydlett expressed that "not being able to do things with my daughter is the biggest problem I have" and that "I've always been active in my life and I can't do anything anymore." (AR 75).

Aydlett testified again at the hearing on October 10, 2012. He stated that he had not received any medical treatment since the last hearing and that "I can't afford insurance so I can't get any treatment." (AR 35). He reported going to the emergency room twice but stated he did not have any x-rays because he is self-pay.[5] To treat his pain, he sits in a Jacuzzi and takes Ibuprofen and other over the counter pain relievers.

Aydlett still drives his daughter to school, and makes her breakfast, lunch, and dinner. (AR 36, 38). He can cook but he cannot bring in their 5 gallon containers of

_____

[5] There is no record of emergency room visits aside from a discharge summary from Northwest Medical Center dated May 25, 2011. (AR 605).

1    water. (AR 39–40). He used to be able to do laundry but cannot lift the laundry baskets

2    and cannot play with his daughter. (AR 40). Aydlett grocery shops with his wife but does

3    not lift anything. He can sit for 45 minutes in the car but it is uncomfortable, and walking

4    up and down the stairs is hard for him. (AR 41).

5        When questioned by the ALJ why he would not be able to do a sit-down job,

6    Aydlett testified that he cannot sit for more than an hour because his leg goes numb and

7    gets a burning sensation. (AR 39). It gets better if he stands for 15 minutes, and then he

8    can sit for another hour. He could not get up and then sit down again for 8 hours. Laying

9    down does not help, and he has to sleep in his recliner.

10              F.  Lay Testimony

11       The claimant's wife, Susan Aydlett, submitted a letter dated October 17, 2010.

12   (AR 340). Mrs. Aydlett stated that she has "seen him go from being able to do very hard

13   work to now barely able to move on some days." She described her husband's condition

14   as follows:

15           When bending at the knees to pick something up you can hear
             cracking noises. He struggles to get back up. He can be
16           walking down the hall and a knee will buckle which send jolts
             through his body. At times his knee has locked up like it
17           doesn't want to bend.

18           He can be stretching with his arms above his head and his
             shoulder will go out of socket. I've seen him trying to do
19           things around the house to help like dishes, laundry, etc., only
             to find he is wincing in pain. When doing these things he has
20           felt sharp shooting pains go down his legs and arms. He has
             complained of his arms feeling tingly and going numb.
21

22           . . .

23           He hasn't gone to the doctors constantly due to the fact we
             can't afford it. My medical at work is too much to add him on
24           and he doesn't qualify for AHCCCS because of my income.

25   *Id.*

26              G.  Vocational Evidence

27       Vocational Expert ("VE") Jose Chaparro testified at the hearing before the ALJ on

28   October 10, 2012. He described Aydlett's past work as follows: commercial cleaner,

heavy and unskilled; merchandise delivery, medium and unskilled; hand packager, medium and unskilled; truck driver helper, heavy and unskilled. (AR 42–43).

Based on the first hypothetical presented by the ALJ, Chaparro testified that a person who could do the full range of medium work with no other limitations could do the jobs of merchandise delivery and hand packager. (AR 43). Based on the second hypothetical presented by the ALJ,[6] Chaparro testified that a person with those limitations could do jobs at the light level such as ticket seller, toe closing machine tender, and outside deliverer. (AR 44–45). Based on the third hypothetical presented by the ALJ, Chaparro testified that a person who could do the full range of light work "could do the world of light and sedentary unskilled work, and he could perform the jobs I proposed in hypothetical two." (AR 46). Chaparro gave examples including fast food worker and cashier II.

### H. ALJ's Findings

#### i. December 22, 2011 Decision

The ALJ found that Aydlett had the severe impairment of degenerative disc disease, but that the medical evidence of record did not establish that Aydlett's impairment met or medically equaled the criteria of SS listing 1.04. (AR 130–31).

The ALJ found that Aydlett's statements regarding the intensity, persistence, and limiting effects of his symptoms were "not credible to the extent they are inconsistent with the . . . [RFC] assessment." (AR 131). The ALJ stated that Aydlett was "less than credible with respect to the extent to which his impairments preclude the performance of work related activities" because "examination of the claimant found that he remained highly functional and able to perform work," and because when Aydlett collected unemployment benefits, he "represented that he was ready, willing, and able to work and was, in fact, actively seeking employment." (AR 132–33). The ALJ noted that Aydlett's

---

[6] This hypothetical included the following limitations: lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand or walk for 4 out of 8 hours; sit more than 6 hours; occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; no limit on balance; avoid moderate exposure to fumes, odors, dust, gases, poor ventilation, and hazards. (AR 43–44).

receipt of unemployment benefits was not dispositive of his disability claim, but that his inconsistent statements regarding his ability to do work negatively impacted his credibility. (AR 133).

The ALJ gave great weight to Dr. Krasner's opinion because he was able to personally examine Aydlett and review his medical history, and because Dr. Krasner's "findings are recent and consistent with the majority of the medical evidence of record." (AR 132). The ALJ gave no weight to the letter written by Dr. Wild because "Dr. Wild has not treated or examined the claimant since 1994 and is unable to give any opinion as to the claimant's current level of functioning." The ALJ stated that she could not give significant weight to Susan Aydlett's letter because she was not medically trained to make exacting observations as to frequencies and degrees of medical signs and symptoms, because she was not a disinterested third party, and, "[m]ost importantly," because her testimony, "like the claimant's, is simply not consistent with the preponderance of the opinions and observations by medical doctors in this case."

The ALJ found that Aydlett had the RFC to perform the full range of medium work. (AR 131). She concluded that he could perform his PRW as a maintenance person/property manager, a liquidator, a pizza delivery driver, a mail room stock person, and an assembler, both as actually and generally performed. (AR 133). The ALJ therefore concluded Aydlett was not disabled.

## ii.  December 17, 2012 Decision

The ALJ found that Aydlett had the severe impairments of degenerative disc disease and degenerative joint disease, but that these impairments did not meet or medically equal the severity of one of the listed impairments. (AR 22–23).

The ALJ again found that Aydlett's statements regarding the intensity, persistence, and limiting effects of his symptoms were "not credible to the extent they are inconsistent with the . . . [RFC] assessment." (AR 23). The ALJ noted that Aydlett's PT records stated he had good potential for improvement, that he responded favorably to treatment, and that his compliance with appointments was sporadic. The ALJ also noted that at the CE,

Aydlett reported that his knees were feeling fine, that he had intermittent low back pain but no numbness or tingling, and that he was not taking any pain medications. (AR 23–24). The ALJ noted Dr. Krasner's opinion that Aydlett would be able to work at a medium exertional level with no sitting, standing, walking, postural, or environmental limitations. (AR 24). The ALJ further noted that Aydlett had not sought any further treatment and that he only took over the counter medications. The ALJ also stated that she found Aydlett "to be less than credible with respect to the extent to which his impairments preclude the performance of all work" because the CE indicated that he remained capable of performing some work, because objective studies revealed that his impairments were not so severe as to require surgery, and because Aydlett had sought minimal treatment and did not take prescription medications. (AR 24).

The ALJ again gave great weight to the opinion of Dr. Krasner because he was able to personally examine Aydlett and review his medical history, and because he obtained updated radiological studies of Aydlett's knee and back. (AR 24). The ALJ noted that she found "Dr. Krasner's opinion to be well based upon the objective medical evidence and, accordingly, gives it controlling weight." The ALJ gave reduced weight to the opinion of the state agency medical consultant Dr. Kalen who opined that Aydlett was limited to sedentary work because the consultant "did not have the opportunity to personally examine the claimant." The ALJ noted that she thus felt "that Dr. Krasner's opinion is more likely to accurately reflect the claimant's [RFC]." The ALJ gave reduced weight to Dr. Wild's opinion that Aydlett was precluded from heavy work. The ALJ noted that Dr. Wild did not opine that Aydlett was precluded from all work, and that he recommended Aydlett be trained to do other work.

The ALJ again found that Aydlett had the RFC to perform the full range of medium work. (AR 23). She concluded that he could perform his PRW as a pizza delivery person and as a hand packer, both as actually and generally performed. (AR 25). The ALJ therefore concluded Aydlett was not disabled.

. . .

1

### III.    Standard of Review

2        The Commissioner employs a five-step sequential process to evaluate SSI and

3    DIB claims. 20 C.F.R. §§ 404.920, 416.1520; *see also Heckler v. Campbell*, 461 U.S.

4    458, 460-462 (1983). To establish disability the claimant bears the burden of showing he

5    (1) is not working; (2) has a severe physical or mental impairment; (3) the impairment

6    meets or equals the requirements of a listed impairment; and (4) the claimant's residual

7    functional capacity ("RFC") precludes him from performing his past work. 20 C.F.R. §§

8    404.920(a)(4), 416.1520(a)(4). At Step Five, the burden shifts to the Commissioner to

9    show that the claimant has the RFC to perform other work that exists in substantial

10   numbers in the national economy. *Hoopai v. Astrue*, 499 F.3d 1071, 1074 (9th Cir. 2007).

11   If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any

12   point in the five-step process, she does not proceed to the next step. 20 C.F.R. §§

13   404.920(a)(4), 416.1520(a)(4).

14       Here, Aydlett was denied at Step Four of the evaluation process. Step Four

15   requires a determination of whether the claimant has sufficient RFC to perform past

16   work. 20 C.F.R. §§ 404.1520(e), 416.920(e). RFC is defined as that which an individual

17   can still do despite his limitations. 20 C.F.R. §§ 404.1545, 416.945. A RFC finding is

18   based on the record as a whole, including all physical and mental limitations, whether

19   severe or not, and all symptoms. Social Security Ruling (SSR) 96-8p. If the ALJ

20   concludes the claimant has the RFC to perform past work, the claim is denied. 20 C.F.R.

21   §§ 404.1520(f), 416.920(f).

22       The findings of the Commissioner are meant to be conclusive. 42 U.S.C. §§

23   405(g), 1383(c)(3). The court may overturn the decision to deny benefits only "when the

24   ALJ's findings are based on legal error or are not supported by substantial evidence in the

25   record as a whole." *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001). As set

26   forth in 42 U.S.C. § 405(g), "[t]he findings of the Secretary as to any fact, if supported by

27   substantial evidence, shall be conclusive." Substantial evidence "means such relevant

28   evidence as a reasonable mind might accept as adequate to support a conclusion,"

*Valentine*, 574 F.3d at 690 (internal quotation marks and citations omitted), and is "more than a mere scintilla, but less than a preponderance." *Aukland*, 257 F.3d at 1035. The Commissioner's decision, however, "cannot be affirmed simply by isolating a specific quantum of supporting evidence." *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998) (internal citations omitted). "Rather, a court must consider the record as a whole, weighing both evidence that supports and evidence that detracts from the Secretary's conclusion." *Aukland*, 257 F.3d at 1035 (internal quotation marks and citations omitted).

The ALJ is responsible for resolving conflicts in testimony, determining credibility, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "When the evidence before the ALJ is subject to more than one rational interpretation, [the court] must defer to the ALJ's conclusion." *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004). This is so because "[t]he [ALJ] and not the reviewing court must resolve conflicts in evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (internal citations omitted).

Additionally, "[a] decision of the ALJ will not be reversed for errors that are harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). The claimant bears the burden to prove any error is harmful. *McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011) (*citing Shinseki v. Sanders*, 556 U.S. 396, 129 S.Ct. 1696, 1706 (2009)). An error is harmless where it is "inconsequential to the ultimate nondisability determination." *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) (internal citations omitted); *see also Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006). "[I]n each case [the court] look[s] at the record as a whole to determine whether the error alters the outcome of the case." *Molina*, 674 F.3d at 1115. In other words, "an error is harmless so long as there remains substantial evidence supporting the ALJ's decision and the error does not negate the validity of the ALJ's ultimate conclusion. *Id.* (internal quotation marks and citations omitted). Finally, "[a] claimant is not entitled to benefits under the statute unless the claimant is, in fact, disabled, no matter how egregious the ALJ's errors

1    may be." *Strauss v. Comm'r Soc. Sec.*, 635 F.3d 1135, 1138 (9th Cir. 2011).

2    **IV.    Analysis**

3        Aydlett argues that the ALJ erred in weighing the treating and consulting medical

4    opinions and in giving improper consideration to Aydlett's lack of treatment. (Doc. 17 at

5    8). Aydlett also states generally that the ALJ failed to consider substantial evidence on

6    record, including unemployment benefits information, physical therapy records, and third

7    party statements. *Id.* at 8, 15.[7]  Aydlett contends that these errors resulted in a

8    nondisability determination that is not supported by substantial evidence, and requests

9    that this Court find that he is entitled to benefits. *Id.* at 15. Alternatively, Aydlett requests

10   that this matter be remanded for further administrative proceedings. *Id.* at 16.

11       The Commissioner contends that the Court should affirm the ALJ's decision

12   "because she reasonably weighed the available evidence and concluded Aydlett could

13   perform medium work with some additional restrictions." (Doc. 21 at 2). The

14   Commissioner further states that Aydlett has failed to demonstrate harmful error

15   requiring remand for an award of benefits, and requests that if the Court does find error,

16   that this matter be remanded for further administrative proceedings. *Id.* at 12.

_____

18       [7] Plaintiff's cursory reference to these issues does not warrant further discussion
by the Court. "A plaintiff challenging the Commissioner's final decision regarding
19   disability must specifically and directly argue issues in his or her opening brief." *Schopp
v. Colvin*, 2014 WL 4722524, at *4 (D. Or. Sept. 22, 2014). "A plaintiff must also carry
20   his or her burden in establishing how the alleged errors were prejudicial." *Id.*  "We
review only issues which are argued specifically and distinctly in a party's opening brief.
21   We will not manufacture arguments for an appellant, and a bare assertion does not
preserve a claim . . . ." *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994) (internal
22   citation omitted). As indicated by the Ninth Circuit in *Greenwood*, "[j]udges are not like
pigs, hunting for truffles buried in briefs." *Id.* (quoting *United States v. Dunkel*, 927 F.2d
23   955, 956 (7th Cir.1991) (per curiam)). Consequently, the Ninth Circuit has refused to
address claims that were only "argue[d] in passing," *Brownfield v. City of Yakima*, 612
24   F.3d 1140, 1149 n. 4 (9th Cir. 2010), or that were "bare assertion[s] . . . with no
supporting argument," *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1079 n. 26
25   (9th Cir. 2008).

26       Here, Aydlett fails to identify any specific errors in the ALJ's analysis of his
unemployment benefits records, physical therapy records, or the third party statements,
27   nor does Aydlett articulate how the ALJ erred in assessing his credibility. Because
Plaintiff's contention that the ALJ failed "to consider substantial evidence on record" was
28   not argued with specificity, this argument is waived and the Court declines to address the
issue.

The Court concludes that the ALJ properly assessed the non-examining state-agency medical consultant's opinion and the treating physician's opinion, and that the ALJ did not give improper consideration to Aydlett's lack of treatment. Accordingly, the decision of the Commissioner will be affirmed.

### A. Lack of Medical Treatment

The ALJ's finding that Aydlett was not fully credible regarding the intensity, persistence, and limiting effects of his symptoms was based in part on her observation that Aydlett had not sought further treatment and only took over the counter medications for his impairments. (AR 24). The ALJ noted that "the claimant has sought only minimal medical treatment and does not take prescription medications to treat his pain." *Id.*

"[I]f a claimant complains about disabling pain but fails to seek treatment, or fails to follow prescribed treatment, for the pain, an ALJ may use such failure as a basis for finding the complaint unjustified or exaggerated." *Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007). However, "[d]isability benefits may not be denied because of the claimant's failure to obtain treatment he cannot obtain for lack of funds." *Id.* (quoting *Gamble v. Chater*, 68 F.3d 319, 321 (9th Cir. 1995)). While Social Security regulations require claimants to follow "treatment prescribed by [a] physician" to receive benefits, the same regulations make clear that if the claimant has "a good reason" for not following the prescribed treatment, rejection of treatment will not be held against the claimant. 20 C.F.R. § 416.930(a) & (b); SSR 96–7p. The ALJ "'must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment' including inability to pay . . ." *Orn*, 495 F.3d at 638 (*quoting* SSR 96–7p at 7–8).

Here, Aydlett alleges that the ALJ based her decision in part on the fact that there was minimal evidence of medical treatment in the record and because Aydlett did not take prescription medications for his pain. (Doc. 17 at 10). Aydlett further alleges that the

ALJ failed to acknowledge that he did not have medical insurance or the funds to "seek the needed surgeries." *Id.* While there is no evidence in the record that any surgeries were actually recommended, Aydlett posits that treatment "would have likely involved further surgeries in light of the severity of his impairments revealed by the radiological evidence." *Id.* However, this is pure speculation on Aydlett's part and there is nothing in the record to indicate that any surgeries were ever recommended. While Aydlett told Dr. Krasner that he was referred to a neurosurgeon and testified to the same, there is no evidence in the record of a referral. (AR 66, 69, 595).

Further, while Aydlett contends that he did not seek further treatment due to lack of insurance, Aydlett testified that he received AHCCCS from approximately March 2009 through September 2010, but did not seek any treatment for his knees during this time. (AR 67).[8] Aydlett testified that he did see Dr. Kisner during this time for problems with his back and neck (AR 68), but the record reveals that Aydlett only saw Dr. Kisner a total of three times: Aydlett saw Dr. Kisner on January 20, 2010 with a complaint of back pain for 1–2 months (AR 594) and was referred for a x-ray of the lumbar spine which showed minimal lumbar scoliosis (AR 590). Aydlett saw Dr. Kisner again on February 8, 2010 with a complaint of continuing severe back pain (AR 593), and again on July 16, 2010 for treatment of an ingrown toenail (AR 592). Aydlett does not point to any evidence or make any claims that he was prescribed additional treatments or surgeries that AHCCCS would not cover. The record indicates that Aydlett was prescribed Diclofenac on February 8, 2010, but there is no information as to whether he ever obtained this medication. (AR 593). Thus, while Aydlett may have been without insurance since September 2010 (or January 2011, as indicated by the AHCCCS letter), in the time period that he did have AHCCCS or other insurance coverage, he sought only

---

[8] It is somewhat unclear as to when exactly Aydlett did and did not have insurance coverage. A letter from Aydlett's prior counsel states that Aydlett lost his own insurance in August 2010 and his AHCCCS coverage in January 2011. (AR 192). A letter from AHCCCS states that Aydlett's coverage was denied as of January 2011. (AR 361). There is no evidence in the record of any medical treatment prior to Aydlett's appointment with Arizona Family Practice on January 20, 2010. (AR 594).

minimal treatment for his alleged impairments, and the ALJ could properly take this into consideration when determining Aydlett's credibility and the extent of his allegedly disabling conditions. *See Orn*, 495 F.3d at 638; *Leal v. Astrue*, 2009 WL 800935, at *6 (E.D. Cal. Mar. 25, 2009) ("Claimant's lack of treatment-seeking behavior for an allegedly disabling problem, at a minimum, creates considerable uncertainty about the veracity of Claimant's subjective complaints . . .").

In sum, contrary to Aydlett's assertion, the severity of his impairments is *not* clearly established by the medical record, and the ALJ did not err in taking Aydlett's lack of medical treatment into consideration when assessing his credibility and finding that Aydlett was not disabled.

### B. Medical Testimony

Aydlett alleges that the ALJ improperly rejected the RFC opinions of his treating physician, Dr. Wild, and the non-examining state-agency medical consultant, Dr. Kalen.

The Ninth Circuit distinguishes between treating, examining, and nonexamining physicians, and as a general rule, more weight is usually accorded to the treating physician's opinion. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). The ALJ may reject a treating or examining physician's uncontradicted opinion only if he gives clear and convincing reasons for doing so. *Id.* at 830-31; *see also Weetman v. Sullivan*, 877 F.2d 20, 22 (9th Cir. 1989). If the treating or examining physician's opinion is contradicted by another doctor, the ALJ may reject that opinion only if he provides specific and legitimate reasons supported by substantial evidence in the record. *Lester*, 81 F.3d at 830–31. Further, "when evaluating conflicting medical opinions, an ALJ need not accept the opinion of a doctor if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005). Finally, if the ALJ determines that the plaintiff's subjective complaints are not credible, this is a sufficient reason for discounting a physician's opinion that is based on those subjective complaints. *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009).

1

          *i.*   *Dr. Wild*

2

      The record includes a letter from Dr. Wild that was submitted as part of Aydlett's

3

unemployment benefits claim in 2009. (AR 66, 489). The letter states that Aydlett has

4

been under Dr. Wild's care since 1993 (AR 576) and that:

5

> The last time we saw him, he had severe endstage arthritis of

6

> his knee post-traumatic. It is my opinion at this time that it is
> deleterious to his health to work in any type of full

7

> weightbearing capacity, or capacity requiring frequent
> walking, lifting, or any heavy activities. This is a permanent

8

> restriction. He should be retrained so that he can continue to
> work.

9

(AR 576). Aydlett reported that Dr. Wild performed surgery on his left knee in 1994 to

10

repair ACL and MCL tears, and that he has not had any treatment with Dr. Wild since the

11

1990s. (AR 595).

12

      In her December 22, 2011 decision, the ALJ gave no weight to the letter written

13

by Dr. Wild because "Dr. Wild has not treated or examined the claimant since 1994 and

14

is unable to give any opinion as to the claimant's current level of functioning." (AR 132).

15

In her December 17, 2012 decision, the ALJ gave reduced weight to Dr. Wild's opinion

16

that Aydlett was precluded from heavy work. (AR 24). The ALJ noted that Dr. Wild did

17

not opine that Aydlett was precluded from all work, and that he specifically

18

recommended that Aydlett should be retrained to perform other work.

19

      The Court finds no harmful error by the ALJ in evaluating Dr. Wild's opinion.

20

While Dr. Wild is a treating physician and more weight is usually accorded to a treating

21

physician's opinion, *Lester*, 81 F.3d at 830, Dr. Wild has not actually treated Aydlett

22

since the 1990s. Though Dr. Wild submitted his letter in support of Aydlett's

23

unemployment benefits claim in 2009, the opinions in his letter are based on the knee

24

surgery Dr. Wild performed in 1994. Further, the entirety of Dr. Wild's opinion consists

25

of a brief, one paragraph letter without any supporting evidence, and the ALJ is not

26

required to accept an opinion that is inadequately supported by clinical findings. *See*

27

*Bayliss*, 427 F.3d at 1216. Finally, "[a]lthough a treating physician's opinion is generally

28

afforded the greatest weight in disability cases, it is not binding on an ALJ with respect to

the existence of an impairment or the ultimate determination of disability," *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001), and Dr. Wild's statement that Aydlett is unable to work in any full weight-bearing capacity is not the equivalent to a finding of disability under the SSA. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). It is the role of the ALJ to determine whether a claimant is "disabled" within the meaning of the SSA, and that determination is based on both medical and vocational components. *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001).

The Court concludes that the ALJ could properly assign reduced weight to Dr. Wild's opinion where Dr. Wild has not actually treated Aydlett since the 1990s and where the limitations Dr. Wild assessed in his letter were based on treatment that occurred 15 years earlier. Further, while Dr. Wild opined that Aydlett should not perform work requiring frequent walking, lifting, or heavy activities, he did not opine that Aydlett was unable to perform any work at all. Accordingly, the ALJ did not err by according Dr. Wild's letter reduced weight.

Aydlett also argues that the ALJ failed to pose a hypothetical to the VE with the limitations described by Dr. Wild. (Doc. 17 at 12). However, the ALJ is only required to include restrictions in a hypothetical that are supported by substantial evidence. *See Greger v. Barnhart*, 464 F.3d 968, 973 (9th Cir. 2006). Here, the ALJ assigned reduced weight to Dr. Wild's opinion, and gave specific and legitimate reasons for the weight finding. Because the ALJ properly assigned reduced weight to the opinion, the ALJ was not required to include all of Dr. Wild's limitations in the hypothetical to the VE, particularly where those limitations were not supported by objective findings on examination.[9] The undersigned also notes that while Dr. Wild's letter states that "at this time [] it is deleterious to [Aydlett's] health to work in any type of full weightbearing capacity, or capacity requiring frequent walking, lifting, or any heavy activities," the

---

[9] *See e.g.*, Dr. Krasner's findings that Aydlett was able to walk normally, do a deep-knee bend fully, and had full range of motion of the hips, knees, and ankles with normal muscle strength. (AR 596).

letter does not contain any specific recommendations as to how frequently Aydlett could walk or lift, or what exactly Dr. Wild meant by heavy activities.

Accordingly, the Court finds that the ALJ did not err in assigning reduced weight to Dr. Wild's opinion, and in not including all of the limitations assessed by Dr. Wild in the hypothetical to the VE.

### ii. Dr. Kalen

Aydlett's application for DIB was denied on reconsideration on January 6, 2011. (AR 113). As part of that determination, state-agency medical consultant Dr. Kalen completed a RFC assessment for Aydlett based on the record, but did not examine Aydlett directly. Aydlett contends that the ALJ improperly rejected Dr. Kalen's opinion in favor of Dr. Krasner's opinion, and that the ALJ erred in failing to consider Dr. Kalen's opinion with the record as a whole. (Doc. 17 at 13, 15).

Opinions of non-examining physicians are generally entitled to less weight than treating or examining physician opinions. *Lester*, 81 F.3d at 830. Here, Dr. Kalen opined that Aydlett did not have the RFC to perform his PRW as actually performed or generally performed, but that he could perform other sedentary work. (AR 112–13). The ALJ gave reduced weight to Dr. Kalen's opinion that Aydlett was limited to sedentary work because Dr. Kalen "did not have the opportunity to personally examine the claimant." (AR 24). The ALJ noted that she thus felt "that Dr. Krasner's opinion is more likely to accurately reflect the claimant's [RFC]."[10]

The Court finds that the ALJ properly resolved the conflict between Dr. Krasner's opinion and Dr. Kalen's opinion by assigning reduced weight to Kalen's opinion because she did not personally examine Aydlett. In the hierarchy of medical opinions, Ninth Circuit case law holds that opinions from nonexamining and nontreating sources are to be given the least weight in assessing disability, and while Aydlett objects to the ALJ giving

---

[10] Dr. Krasner performed a physical CE of Aydlett and opined that Aydlett would "have some mild effects on his functional capabilities especially as it pertains to heavy lifting." (AR 597). Dr. Krasner specifically recommended that Aydlett could lift 50 pounds occasionally and 25 pounds frequently, and that Aydlett had no limitations in sitting, standing, or walking. (AR 601–02).

greater weight to Dr. Krasner's opinion than to Dr. Kalen's opinion, "[t]he opinion of an examining physician is . . . entitled to greater weight than the opinion of a nonexamining physician." *Lester*, 81 F.3d at 830. Moreover, the regulations specifically note that while an ALJ must consider opinion evidence from state-agency physicians, ALJs "are not bound by any findings made by State agency medical or psychological consultants." 20 C.F.R. § 404.1527(e)(2)(i).

Accordingly, the ALJ did not err by giving reduced weight to Dr. Kalen's opinion where Dr. Kalen was neither a treating nor an examining physician and did not personally perform an assessment of Aydlett's functional abilities and restrictions. The ALJ gave properly gave greater weight to the opinion of Dr. Krasner because he personally examined Aydlett and ordered updated radiological studies of Aydlett's knee and back, and this was a specific and legitimate reason to accord less weight to Dr. Kalen's opinion.

**V.    Remedy**

A federal court may affirm, modify, reverse, or remand a social security case. 42 U.S.C. § 405(g). Absent legal error or a lack of substantial evidence supporting the ALJ's findings, this Court is required to affirm the ALJ's decision. After considering the record as a whole, this Court simply determines whether there is substantial evidence for a reasonable trier of fact to accept as adequate to support the ALJ's decision. *Valentine*, 574 F.3d at 690. Here, the record contains sufficient substantial evidence to meet this standard. The Court concludes that the ALJ's findings are supported by substantial evidence and there is no legal basis for reversing or remanding her decision. Therefore, Aydlett is not entitled to relief.

**VI.    Conclusion**

In light of the foregoing, **IT IS HEREBY ORDERED** that the decision of the Commissioner of Social Security is **affirmed**. The Clerk shall enter judgment accordingly and close its file on this matter.

. . .

. . .

- 25 -

1    Dated this 25th day of July, 2016.

2

3

4

5    Eric J. Markovich
     United States Magistrate Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28